NOT FOR PUBLICATION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

———————————————————— :
                                    :
PATRICIA A. MURPHY,                 :
                                    :
                    Plaintiff,      :       Civil No. 13-5508 (RBK)
                                    :
        v.                          :       **OPINION**
                                    :
CAROLYN W. COLVIN, Acting           :
Commissioner of Social Security,    :
                                    :
                    Defendant.      :
———————————————————— :

**KUGLER**, United States District Judge:

This matter comes before the Court on the appeal filed by Plaintiff Patricia A. Murphy ("Plaintiff") from the decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff disability insurance benefits ("DIB"), pursuant to Section 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g).  For the reasons expressed herein, the Court will vacate the Commissioner's decision that Plaintiff is not entitled to DIB, and remand the matter to the Administrative Law Judge ("ALJ").

## I.    BACKGROUND

### A.  Procedural History

On July 6, 2010, Plaintiff protectively filed an application for a period of disability and DIB under Title II of the Act, alleging that she became disabled on June 1, 1998. Tr. 79-80. Plaintiff alleged disability due to neuropathy in the lower extremities, malignant schwannoma, optic neuritis, severe arthritis in her shoulders, hips, and knees, right knee replacement, and herniated discs. Tr. 17. Plaintiff's claim was denied on September 20, 2010. Tr. 80-85. Plaintiff's

claim was denied again on reconsideration on March 3, 2011. Tr. 87-96. On April 28, 2011, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). Tr. 110-11. On February 22, 2012, Plaintiff appeared before ALJ Frederick Timm. Tr. 26-78. On March 28, 2012, the ALJ found that Plaintiff was not disabled within the meaning of sections 216(i) and 223(d) of the Act between Plaintiff's alleged disability onset date of June 1, 1998 and March 31, 2003, the date last insured. Tr. 13-20. On April 6, 2012, Plaintiff sought review of the ALJ's decision by the Appeals Council. Tr. 8-9. The Appeals Council denied Plaintiff's request for review on July 23, 2013. Tr. 1-3. Plaintiff then filed this action pursuant to 42 U.S.C. § 405(g), seeking district court review of the ALJ's decision.

### B.  Plaintiff's Physical Condition and Medical History

Plaintiff's alleged disability is caused by osteoarthritis in the bilateral knees, keloid,[1] peripheral neuropathy, migraines, and shoulder impingement.

### i.  Prior to the Alleged Onset Date

The record indicates that in 1994, Plaintiff had a drilling arthroplasty of the flexion surface of the medial condyle for traumatic arthritis. Tr. 273. After surgery, Plaintiff received physical therapy for the right knee traumatic arthritis. Tr. 272-73. On August 17, 1995, Plaintiff reported to Dr. John R. Gregg that her right knee was a little "rusty" on rainy days and the left knee tired easily. Tr. 269. However, she also reported she was increasing her activities and could walk up four flights of steps at work. Id. In this same visit with Dr. Gregg, she reported she was occasionally experiencing right leg sciatica, which was associated with parasthesia in between the first and second toe web space causing weakness in the dorsiflexion of her great toe. Id.

---

[1] A keloid is a "scar formation … which is a hard, thick, overgrowth of abnormal tissue, not cancerous, just abnormal, difficult tissue." Tr. 39.

On January 15, 1997, Plaintiff returned to Dr. Gregg, reporting she had pain on terminal knee extension on the medial side of her knee. Tr. 266. She also reported crepitation at her patellotrochlear joint. Id. Dr. Gregg noted she had some synovial puffiness in her right knee and a patellotrochlear crepitation and sensitivity at her medial femoral condyle. Id.  Dr. Gregg noted that Plaintiff was "doing everything perfect and she is very active." Id. On April 10, 1997, Plaintiff sought Dr. Gregg's evaluation of a hallux rigidus and plantar fasciitis of her right foot. Tr. 265. Dr. Gregg noted no significant foot deformities or postural abnormalities. Id.

### ii.   During the Critical Period[2] of June 1, 1998 through March 31, 2003

On July 16, 1998, Plaintiff returned to Dr. Gregg for a follow-up on her right knee. Tr. 262. Dr. Gregg reported that Plaintiff was "reasonably asymptomatic but overtime is noting increasing crepitation at her joint" and "some popliteal fossa discomfort at times." Id. On examination of her right knee, Dr. Gregg found she had "full motion and no evident synovitis." Id. There was, however, palpable and audible patellotrochlear crepitation. Id. She was able to perform a Childress stress test, her gait was normal, and she was "ready to dance at her wedding." Id. Plaintiff saw Dr. Gregg again on December 15, 1998. Tr. 261. On this occasion she was "basically doing well," but her knee function was slowly decreasing. Id. Her right knee was fatiguing easier than the left and she had trouble going down steps. Id. Crepitation was still palpable and audible. Id. Upon examination, Dr. Gregg found some synovial thickening, but no effusion. Id. She had full knee extension and flexion up to one hundred thirty degrees. Id. Dr.

---

[2] Plaintiff alleges disability under sections 216(i) and 223(d) of the Act. Tr. 13. In order to be eligible for disability insurance benefits under these sections, Plaintiff must be insured under the Social Security program. Insured Status Requirements, THE SOCIAL SECURITY ADMINISTRATION, http://www.ssa.gov/oact/progdata/insured.html. The Social Security Administration considers the number of quarters of coverage earned to determine if a plaintiff is insured. Id. In this case, Plaintiff last met the insurance coverage requirement for disability benefits on March 31, 2003. Tr. 13. Thus, Plaintiff must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits. Id. This time period will be referred to as the "critical period."

Gregg noted Plaintiff "works out on a bike and she works hard on a farm, so she is doing a lot of therapy for her legs." Id. Further, he noted "she is training Bruce Springsteen's horses now." Id.

A year later, on December 15, 1999, Plaintiff saw Dr. Gregg again. Tr. 260. This time, Plaintiff reported "a history of left knee pain of several months duration and not associated with any particular activity or history of trauma." Id. The pain occurred during periods of long immobilization and occasionally woke her up at night. Id. She reported no numbness or tingling. Id. Dr. Gregg noted "some significant degenerative changes particularly of her patellotrochlear area" and scheduled her for an MRI. Id. A week later, on December 22, 1999, Plaintiff saw Dr. Gregg for a follow-up appointment. Tr. 259. She reported the same knee pain, but no numbness or tingling. Id. Her MRI revealed significant osteoarthritic changes that were "a little advanced for her age." Id. Three Synvisc injections were arranged in one-week intervals. Id.

On April 14, 2000, Plaintiff saw Dr. Gregg again. Tr. 258. She reported increased swelling and stiffness in her knee without trauma. Id. Dr. Gregg noted that she was "so uncomfortable she came to see [him] between cases at Graduate." Id. Dr. Gregg diagnosed her with stress synovitis of the left knee. Id. On June 29, July 6, and July 12, 2000, Plaintiff saw Dr. Gregg for Synvisc injections. Tr. 255-57.

On May 1, 2002, Dr. Gregg sent a letter to Dr. Allen Auerbach to update him on Plaintiff's evaluation. Tr. 252. Dr. Gregg noted in Plaintiff's past medical history that "[s]he has no other significant illnesses." Id. Dr. Gregg recommended more Synvisc injections. Tr. 253.

### iii.  After the Critical Period

On May 7, 2004, Plaintiff was seen at Christiana Care Health Services for the excision of a keloid and biopsy to rule out recurrent schwannoma. Tr. 311. The keloid was the result of a schwannoma that had been previously excised and radiated. Id.

On July 13, 2005, Plaintiff began seeing Dr. Paul Bussey.[3] Tr. 428. Plaintiff had been suffering from a headache for over a week. Id. On July 16, 2005, Plaintiff was admitted to Christiana Care Health Services for the "worst headache of her life" including symptoms of photophobia and nausea. Tr. 305. Plaintiff was treated with Prednisone, Dilaudid, and Phenerghan. Tr. 306.

On June 29, 2006, Plaintiff underwent a right knee x-ray. Tr. 474. There was moderate to moderately severe degenerative joint disease in the medial patella-femoral compartment. Id. On October 4, 2006, Plaintiff underwent x-rays on both knees that indicated tricompartmental osteoarthritis. Tr. 334. The Plaintiff also had an MRI of the right knee that day with severe degenerative changes found in the patellofemoral joint. Id.

On November 22, 2006, Dr. Carl Diermengian did an arthroscopy of the right knee. Tr. 317. This was a short-term solution for the pain the Plaintiff was experiencing. Id. Dr. Diermengian determined that long-term prognosis of the knee was not very good because the Plaintiff had end-stage osteoarthritis. Tr. 318. Plaintiff followed up with Dr. Diermengian on July 23, 2007. Tr. 555. Plaintiff's knee had underlying arthritis, was clicking, and beginning to hurt in the patellofemoral area. Id.

On July 10, 2006, Plaintiff saw Dr. Bussey for a bubble on her right knee, decreased range of motion, pain in the shoulder, and a rash. Tr. 418. On July 27, 2007, Plaintiff underwent an MRI of the right shoulder. Tr. 330. On July 31, 2007, Dr. Abboud reviewed the MRI and found partial thickness tendinosis of the rotator cuff involving the supraspinatus tendon, small joint effusion, and type 1 SLAP degeneration. Tr. 552. On August 13, 2007, Dr. Abboud

---

[3] Dr. Paul Bussey testified before the ALJ that Plaintiff was seeing Dr. Allen Greenberg prior to 2005. Tr. 41. However, Dr. Bussey was unable to obtain Dr. Greenberg's records because "Dr. Greenberg took a long vacation and has yet to be heard from." Id.

performed an arthroscopy on Plaintiff's right shoulder. Tr. 314. Dr. Abboud's post-operative diagnoses included a right shoulder impingement and possible rotator cuff tear. Id.

On January 2, 2008, Plaintiff was seen by Dr. Bussey because she was feeling sparks in her right arm, eye, and chest. Tr. 416. She was also experiencing decreased vision, double vision, and ocular pain. Id. Dr. Bussey opined that Plaintiff was suffering from optic neuritis and ordered an MRI. Id.

On January 15, 2008, Plaintiff underwent a thoracic MRI. Tr. 319. Results revealed a mild diffuse bulging disc without evidence of herniation. Id.

A July 20, 2008 x-ray of Plaintiff's knee revealed mild to moderate degenerative changes. Tr. 323.

On October 9, 2008, Plaintiff had an MRI of her brain. Tr. 321. There were white matter changes inconsistent with the typical appearance for demyelinating disease. Id. A cervical MRI was also done. Id. The spinal cord was found to be normal in caliber and signal characteristics. Tr. 322. There were minimal degenerative changes. Id.

On September 18, September 25, October 2, October 23, and October 30, 2009, Plaintiff received Hylaluronic Acid therapy for her left knee with Dr. Soloway. Tr. 353. The treatment was tolerated well by Plaintiff. Id. On December 2, 2009, Plaintiff underwent a right total knee arthroplasty by Dr. Diermengian. Tr. 377.

In January 2010, Plaintiff was seen at Heartland Rehabilitation Services for joint pain that woke her up at night. Tr. 386. A month later Plaintiff saw Dr. Bussey for dizzy spells; Plaintiff was put on Meclizine and an MRI was ordered. Tr. 406. Plaintiff's MRI, done in March of that year, revealed some changes in her frontal and parietal lobes, possibly related to small vessel changes. Tr. 429. A month later, in April, Plaintiff had two more MRIs: one on her lumbar spine

and one on her right thigh. Tr. 490-91. The MRI on the lumbar spine was for lower back pain

and leg radiculopathy. Id. In September and October of 2010, Plaintiff saw Dr. Abboud for pain

in her left shoulder. Tr. 531, 535-36. The possibility of surgery was discussed. Tr. 531.

### iv.   Impairment Questionnaires

In 2011 and 2012, Dr. Diermengian and Dr. Bussey, respectively, filled out impairment

questionnaires regarding the plaintiff.

### 1.   Dr. Diermengian

On February 11, 2011, Dr. Diermengian completed a lower extremities impairment

questionnaire. Tr. 713. Dr. Diermengian listed Plaintiff's condition as right knee replacement and

left knee arthritis. Id. The prognosis was listed as poor. Id. Plaintiff's symptoms were listed as

pain and difficulty ambulating. Tr. 714. Plaintiff's left knee pain was listed as severe and

occurring hourly/daily when walking, requiring her to use a right hand cane. Tr. 715. Plaintiff

could not climb stairs without a handrail, she could not travel independently, and she could not

bathe or dress independently. Tr. 716. Dr. Diermengian determined that Plaintiff could not sit or

stand for more than an hour. Id. After an hour of sitting, Plaintiff would need to stand up and

walk around for at least ten minutes. Id. Plaintiff could not lift or carry any weight. Tr. 717. Dr.

Diermengian opined that Plaintiff frequently experienced severe pain and fatigue that interfered

with her attention and concentration. Tr. 718. Further, he opined that she would miss more than

three days of work per month and she existed in this capacity since 2000-to-mid-2001. Tr. 719.

### 2.   Dr. Bussey

On January 3, 2012, Dr. Bussey completed a multiple impairment questionnaire. Tr. 721.

Plaintiff's major diagnoses included: (1) neurologically diminishing functions due to the onset of

peripheral neuropathy; (2) visual impairment in the left eye with shattered vision; (3)

schwannoma; (4) onset of neuro tremors and fine motor skill weaknesses; and (5) orthopedic limitations of range and function due to degenerative arthritis in all major joints. Id. Pain management had been unsuccessful for the plaintiff due to the level, duration, and frequency of the pain. Tr. 722. Plaintiff was having pain in both shoulders, both knees, both hip joints, and the left chest area; left neuro arm spasms; neuro tremors; and peripheral neuropathy. Id. Her pain was constant and triggered by any movement. Tr. 723. In Dr. Bussey's opinion, Plaintiff should never lift or carry any amount of weight and had specific limitations doing repetitive reaching, handling, fingering, or lifting due to pain, loss of endurance, weakness in extremities and neuropathy. Tr. 724. According to Dr. Bussey, Plaintiff could neither do a full-time competitive job on a sustained basis nor engage in "low stress" employment. Tr. 725.

### v.  Hearing Testimony

#### 1.  Dr. Bussey

Dr. Bussey testified that he began treating Plaintiff in July of 2005. Tr. 32. At this time, he diagnosed her with multiple joint degeneration, back, knee, and shoulder pain that had become progressive and significant from years prior. Tr. 33. Oral medication, orthopedic assistance, and joint injections did not provide Plaintiff with significant relief. Id. Dr. Bussey further testified that Plaintiff experienced significant pain with standing and prolonged walking without significant alleviation with rest. Id. Dr. Bussey testified that Plaintiff's described symptoms began five-to-ten years earlier. Tr. 34. He based this on her prior records, the condition she was in when she came to see him, and the progression of her condition since. Id.

Dr. Bussey testified that Plaintiff had a malignant schwannoma that was irradiated. Id. After it was irradiated, Plaintiff began suffering shooting pains down her arm. Id. Plaintiff was

suffering from neuropathy that caused numbness, tingling, and decreased sensation in her hands. Tr. 36.

Dr. Bussey testified that there was no job that Plaintiff would be capable of doing because of her joint pain, vision loss, and decreased sensation and weakness in her arms and legs. Id. Overworking the joints would further increase Plaintiff's joint degeneration, and it was imperative for Plaintiff to concentrate on physical therapy and medical treatment. Tr. 37. Additionally, Dr. Bussey testified that before he began treating Plaintiff, she suffered from migraine headaches, which, in his opinion, were likely an early predecessor or the beginning of her central nervous issue. Tr. 37-38. Dr. Bussey testified that after Plaintiff's schwannoma was excised and over-radiated in the late nineties, Plaintiff suffered scarring known as a keloid, and burning that probably worsened the track of the central nervous system issue. Id. Finally, Dr. Bussey opined that Plaintiff's functional limitations began prior to March 31, 2003. Tr. 39.

### 2. Plaintiff

Plaintiff testified that she had several surgeries prior to 1998, including 1995, 1996, and 1997. Tr. 46. She was active in physical therapy after those surgeries. Id. On July 5, 1997, she had an epidural injection, which caused complications and hospitalization. Id. At that point, Plaintiff testified that she had used all of her available sick time at her job as a collection's clerk, so she took her boss's suggestion of a no pay family leave for six months, while they held her job. Id. After those six months ended, Plaintiff testified that she still had another surgery to undergo, was still active in physical therapy, and was not at a level to return to work. Tr. 46-47. Plaintiff testified that during her fifth month of leave, she notified her boss that she was still active in physical therapy and that her doctor did not feel she was ready to return to work. Tr. 47. She told her boss she would get back to them in three weeks to notify them as to whether she was able to come back

and perform her job. Id. Plaintiff testified that she did notify her boss after those three weeks that she could not do her job. Id. At that time, she and her employer came to a "mutually agreeable dissolution" of her employment. Tr. 48.

At the time Plaintiff could not return to work, she testified that she was having "migraines … and they were debilitating." Tr. 48. Further, there was "no pattern to them" and "[t]hey would come at anytime and they were very intense." Tr. 48-49. "They would last … several hours." Tr. 51. "It included sensitivity to darkness–I mean light–so I had to be in the dark, and the noise was just incredible. I could … hear my heart beating in my head, and … it was debilitating…but I couldn't lay down long because of my back, so I would sit and lay in a dark room." Id.

She also testified that when she stopped working, "[t]he neuropathy started to expand to my hands and after the schwannoma was found and post the radiation, I started this neuro tremor that I can't control." Tr. 49. When asked by the ALJ whether Plaintiff had discussed a neuro tremor with her physicians during the critical time period, Plaintiff stated she "called it a ping at the time." Id. She further elaborated, "even prior to June 27th of '97, I had discussed a funny shocking feeling, like, you're shocked when you walked across the carpet in the left side of my chest and went down my hand." Tr. 50. Plaintiff stated that after radiation in 2000, "this became very severe, very pronounced." Id. When asked by the ALJ whether she was having problems with her arms and hands "back in that earlier period of time," Plaintiff testified she was "having trouble with my feet, with the neuropathy … it wasn't as severe as now … it was building up over the years to be more and more like its … a numbness ... and a burning, tingling that's constant." Tr. 52. She clarified that this feeling was in "[b]oth hands and both feet." Id.

Regarding her shoulder, Plaintiff testified that she was unable to do household chores such as cooking[4] and laundry. Tr. 55. Her husband remodeled the kitchen shelves so that nothing was above shoulder height because Plaintiff did not "have the strength to lift the pots." Tr. 56. Plaintiff's husband also reconfigured the bathroom to have a "handicap walk-in shower with benches and the high rise toilet and the handrails and things." Id.

Plaintiff testified that she was in a car accident in 1981 and experienced headaches and pain that never went away. Tr. 57. She testified that she only gets three nonconsecutive hours of sleep per night. Id.  During the day, she could not sit for an entire TV show, full dinner, or car rides without having to get up and move around. Tr. 58. She needed to move around all the time. Tr. 59. Plaintiff further testified that her sleep patterns have not improved and that she still wakes up despite medication. Tr. 60. She could walk short distances with breaks. Id.  She has used a walker, cane, crutches, leg braces, and a "TENS unit"[5] in the past to ambulate. Id.

Plaintiff testified that she had not been upstairs in her three-story home in over thirteen years. Tr. 64-65. Her bedroom and bathrooms are on the first floor. Tr. 65. She does not drive more than a mile from her home due to her impaired vision. Tr. 66. Plaintiff testified that her husband drove her to the hearing and that her friend drives her to her doctors appointments. Tr. 67. Plaintiff has not been on any out-of-state vacations since her wedding in 1998 because she cannot sit for long periods of time in the car. Id.

### 3. Vocational Expert

---

[4] Plaintiff testified that she can cook little things like grilled cheese, scrambled eggs, toast, ramen noodles and microwave hot dogs. Tr. 55-56.

[5] A "TENS [unit], or transcutaneous electrical nerve stimulation [unit], is a back pain treatment that uses low voltage electric current to relieve pain." Melinda Ratini, TENS for Back Pain, WEBMD (June 20, 2013), http://www.webmd.com/back-pain/guide/tens-for-back-pain.

Mr. Martin, a vocational expert, also testified at the hearing. Tr. 68. He testified that Plaintiff had past relevant work as a collection's clerk, which was classified as sedentary with a Specific Vocational Preparation ("SVP") of five and semi-skilled. Tr. 69. Mr. Martin also testified that Plaintiff would be able to perform her sedentary job with a residual functional capacity ("RFC") of: "list and carry occasionally 10 pounds, frequently up to three pounds, standing and walking limited to two hours of an eight hour work day, never to climb ladder, rope, scaffold, kneel or crawl … and must avoid concentrated exposure to extreme cold, vibration, and hazards such as heights, moving machinery, sharp edges." Tr. 73–74. Mr. Martin testified that Plaintiff would still be able to perform work as a collection's clerk if she needed to "avoid noise at the four out of five or five out of five levels." Tr. 74. Further, Plaintiff would still be able to perform that work as it is generally performed in the economy even if she was "limited to sitting for only 25 minutes before needing to stand for five minutes." Finally, he testified that if he were to hypothetically add the limitations in Dr. Bussey's questionnaire to a hypothetical person, "that include the sitting ability and standing and walking ability limited to zero to one hours total in an eight our day … and that pain or other limitations would constantly interfere with attention and concentration," it would be work preclusive. Tr. 75-76.

## II.    STANDARD FOR REVIEW OF COMMISSIONER'S DECISION

District court review of the Commissioner's final decision is limited to ascertaining whether the decision is supported by substantial evidence. Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)). Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Morales v. Apfel, 225 F.3d 310, 316 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999)). If the Commissioner's determination is supported by substantial

evidence, the Court may not set aside the decision, even if the Court "would have decided the factual inquiry differently." Fargnoli v. Masanari, 247 F.3d 34, 38 (3d Cir. 2001) (citing Hartranft, 181 F.3d at 360). A district court may not weigh the evidence "or substitute its conclusions for those of the fact-finder." Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992).

Nevertheless, the reviewing court must be wary of treating "the existence vel non of substantial evidence as merely a quantitative exercise" or as "a talismanic or self-executing formula for adjudication." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.") The Court must set aside the Commissioner's decision if the Commissioner did not take into account the entire record or failed to resolve an evidentiary conflict. Schonewolf v. Callahan, 972 F. Supp. 277, 284-85 (D.N.J. 1997) ("Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.") (quoting Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978)). Furthermore, evidence is not substantial if it constitutes "not evidence but mere conclusion," or if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (citing Kent, 710 F.2d at 114).

## III.    DISCUSSION

The Commissioner conducts a five-step inquiry to determine whether a claimant is disabled, and therefore eligible for DIB.  20 C.F.R. § 404.1520(a)(4); Jones v. Barnhart, 364 F.3d

501, 503 (3d Cir. 2004). The Commissioner first evaluates whether the claimant is currently

engaging in any "substantial gainful activity." 20 C.F.R. § 404.1520(b). Such work activity bars

the receipt of benefits. Id. The Commissioner then ascertains whether the claimant is suffering

from a severe impairment, meaning "any impairment or combination of impairments which

significantly limits [the claimant's] physical or mental ability to do basic work activities." 20

C.F.R. § 404.1520(c). If the claimant does not have such a severe impairment that limits her

ability to do basic work activities, the claim will be denied. Id. If the Commissioner finds that the

claimant's condition is severe, the Commissioner moves to the third step and determines whether

the impairment meets or equals the severity of a listed impairment. 20 C.F.R. § 404.1520(d). If

the condition is equivalent to a listed impairment, then it is presumed that the claimant is entitled

to benefits; if not, the Commissioner continues to step four to evaluate the claimant's residual

functional capacity and analyze whether the RFC would enable the claimant to return to her

"past relevant work." 20 C.F.R. § 404.1520(e). The ability to return to past relevant work

precludes a finding of disability. 20 C.F.R. § 404.1520(f). If the Commissioner finds the claimant

unable to resume past relevant work, in the fifth and final step, the Commissioner determines

whether the claimant can adjust to other work. If the claimant has the capacity to perform other

work available in significant numbers in the national economy, based upon factors such as the

claimant's age, education and work experience, the claimant will be found not disabled. 20

C.F.R. § 404.1520(g). If the claimant cannot make an adjustment to other work, she will be

found to be disabled. Id.

### A.  The ALJ's Decision

The ALJ determined that Plaintiff last met the insured status requirement of the Act on March 31, 2003.[6] Tr. 15. Therefore, in order for Plaintiff to be entitled to DIB, she needed to show disability between June 1, 1998 and March 31, 2003. Tr. 13. Addressing step one of the sequential analysis, the ALJ determined that Plaintiff "did not engage in substantial gainful activity during the period from her alleged onset date of June 1, 1998 through her date last insured of March 31, 2003." Tr. 15. While Plaintiff did work during that time period, that work "did not rise to the level of substantial gainful activity." Id.

At step two, the ALJ determined that Plaintiff's "osteoarthritis of the bilateral knees status/post multiple bilateral surgeries" were severe impairments. Id. The ALJ also considered Plaintiff's keloid, peripheral neuropathy, migraines, and shoulder impingement, but determined these were non-medically determinable impairments. Tr. 16. Since Dr. Bussey did not begin treating Plaintiff until 2005 and because there was "no medical evidence or objective medical finding prior to the date last insured," the ALJ credited Dr. Bussey's testimony "generally as supporting [Plaintiff's] recent physical limitations, but accorded little weight in theorizing that [Plaintiff] had disabling headaches prior to [March 31, 2003]." Tr. 16, 19. The ALJ assigned little weight to the Impairment Questionnaire filled out by Dr. Bussey for the same reason and additionally because Dr. Bussey did not include an answer to the question regarding "the earliest date at which the stated limitations applied." Id. The ALJ relied on Dr. Gregg's note on May 1, 2002 that Plaintiff "has had no other significant medical problems." Id. Finally, the ALJ assessed Plaintiff's schwannoma. Id. The ALJ found there was evidence to support the existence, excision, and over-radiation of the schwannoma prior to the date last insured. Id. However, the

---

[6] See supra note 1 for an explanation of the insured status requirement.

ALJ determined the impairment was not severe because "there [was] no convincing evidence that this impairment posed a vocationally significant limitation prior to the date last insured." Id.

Since the ALJ found that Plaintiff's osteoarthritis was a severe impairment, the ALJ moved on to step three. At step three, the ALJ determined "the [plaintiff] did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." Id. The ALJ considered listing 1.02, but determined the evidence did not support a finding that Plaintiff's impairment met the requirements of 1.02. Id.

Before moving to step four, the ALJ determined Plaintiff's RFC. Id. The ALJ found that,

> through the date last insured, [Plaintiff] had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except that she could never climb a ladder, rope or scaffold, kneel or crawl; could only occasionally balance, stoop and crouch; and needed to avoid concentrated exposure to extreme cold, vibration and workplace hazards (such as heights, moving machinery and sharp objects).

Id.

In reaching this conclusion, the ALJ "considered all symptoms and the extent to which these symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p." Id. The ALJ also "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p." Id.

At step four, the ALJ sought to determine whether Plaintiff had the RFC to perform the requirements of her past relevant work by considering (1) whether there were underlying "medically determinable physical or mental impairments"[7] that could be expected to produce

---

[7] In accordance with 20 C.F.R. § 404.1508, the ALJ defined "medically determinable physical or mental impairments" as "impairments that can be shown by medically acceptable clinical and laboratory diagnostic techniques." Tr. 16-17.

Plaintiff's pain and other symptoms; and (2) by evaluating the intensity, persistence, and limiting effects of the Plaintiff's symptoms to determine the extent to which they limited her functioning. Tr. 16-17. The ALJ determined that Plaintiff did have medically determinable physical or mental impairments that could be expected to produce her pain and other symptoms. Id. However, the ALJ also found "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." Id. Thus, at step four, the ALJ determined Plaintiff had the RFC to perform her past relevant work as a collection's clerk during the critical period and denied Plaintiff's request for DIB.

In reaching his conclusion, the ALJ looked at Plaintiff's alleged knee impairments and found that "[Plaintiff] provided little evidence to support disability between June 1, 1998 and March 31, 2003." Tr. 18. "[Plaintiff] received treatment from John R. Gregg, M.D., from 1986 to 2002 for arthritis of her knees." Id. The ALJ found Dr. Gregg's treatment notes persuasive in determining that Plaintiff was not disabled from June 1, 1998 through March 31, 2003. Tr. 17.

First, the ALJ noted that in July of 1998, Dr. Gregg noted, "[Plaintiff] would be able to dance at her upcoming wedding." Tr. 18. In December of 1998, Dr. Gregg stated that "[Plaintiff] was 'basically doing well' but found that her knee function was deteriorating." Id. According to Dr. Gregg's notes, "[Plaintiff] reported trouble going down stairs and crepitation and swelling, but also minimal pain." Id. "Notably, Dr. Gregg indicated that [Plaintiff] worked out on a bike, worked hard on a farm and trained horses." Id. In December of 1999, [Plaintiff] returned to Dr. Gregg complaining of left knee pain. Id. Dr. Gregg ordered an MRI that revealed "arthritic changes with cartilage thinning." Id. Dr. Gregg ordered Synvisc injections, but "[Plaintiff] did not undergo Synvisc injections until June and July 2000." Id. According to Dr. Gregg's notes,

there was no other treatment until May 2002 when [Plaintiff] complained of "dull, aching discomfort of both knees and swelling after pregnancy." Id. The ALJ further found Plaintiff's credibility is "significantly impaired by Dr. Gregg's treatment records stating that Plaintiff was working as a horse trainer in December 1998; [Plaintiff] testified only that she was unable to continue her sedentary job at that time." Id.

The ALJ "accord[ed] great weight to the state medical consultant's Disability Determination Explanation." Id. The Disability Determination Explanation found that:

> [Plaintiff] had the residual functional capacity to occasionally lift and carry ten pounds and frequently up to three pounds; stand and walk for two hours and sit for six hours in an eight hour workday; never climb ladders, ropes, or scaffolds, kneel or crawl; occasionally balance, stoop and crouch; and avoid concentrated exposure to extreme cold, vibration and workplace hazards, such as heights, moving machinery, and sharp objects.

Tr. 18-19. The ALJ determined this was consistent with the objective medical evidence. Tr. 19.

The ALJ found that "[l]ater medical evidence does not support [Plaintiff's] allegations of disability prior to her date last insured." Tr. 18. Dr. Bussey testified that [Plaintiff] came to him for treatment of her osteoarthritis in 2005, but "there is no evidence dating back to March 2003." Id. Further, Dr. Bussey provided letters of support for [Plaintiff's] disability and an Impairment Questionnaire in 2012, "but there are no medical records of objective medical findings to support his conclusions of the requisite periods of June 1, 1998 to March 31, 2003." Id. The ALJ also assigned little weight to the opinion of Dr. Diermengian, because there was no objective medical evidence or medical findings to support his extension of Plaintiff's limitations back to 2000-to-mid-2001. Id.

Thus, the ALJ found that "[Plaintiff] failed to supply medical evidence or objective medical findings to support a more limited [RFC] prior to her date last insured," leading him to

adopt the state medical consultant's RFC determination. Id. Further, the ALJ concluded there was "no evidence in those records to substantiate that the impairments other than the bilateral knee condition imposed disabling effects prior to that date." Id. As for the bilateral knee impairments, the ALJ determined that Plaintiff's credibility was impaired because her testimony conflicted with Dr. Gregg's treatment notes that she was working as a horse trainer. Id. The ALJ thus found that Plaintiff was capable of performing her past relevant work as a collection's clerk, and therefore, she was not under a disability as defined by the Act from June 1, 1998 through March 31, 2003. Id.

**B. Plaintiff's Appeal**

Plaintiff asserts four arguments on appeal: (1) the ALJ erred in finding that Plaintiff's keloid, peripheral neuropathy, migraines, and shoulder impingement were non-medically determinable impairments at step two; (2) The ALJ erred in his determination of onset; (3) The ALJ erred in his determination of Plaintiff's credibility; and (4) The ALJ erred in assigning little weight to the opinions of Dr. Diermengian and Dr. Bussey. These arguments will be discussed in turn.

> **i. The ALJ Erred in Concluding that Plaintiff's Keloid, Peripheral Neuropathy, Migraines, and Shoulder Impingement were Non-Medically Determinable Impairments Solely Because There was no Contemporaneous Objective Medical Evidence During the Critical Period.**

At step two, the ALJ determined that Plaintiff's keloid, peripheral neuropathy, migraines, and shoulder impingement were non-medically determinable impairments because "there is no medical evidence or objective medical finding prior to the date last insured to substantiate the same." Tr. 16. Plaintiff argues that the ALJ erred in finding these conditions to be "non-medically determinable impairments" because the ALJ failed to take into account non-

contemporaneous evidence provided by Doctors Bussey and Abboud. Pl. Br. 23. Plaintiff further

asserts that if the ALJ had done this, he would have found these conditions to be medically

determinable, and thus, would have had to assign functional limitations for those impairments

when setting Plaintiff's RFC. Id. It is Plaintiff's position that these assigned limitations would

have resulted in a finding of disability. Id. The Commissioner argues that (1) there is not a single

mention of keloids, peripheral neuropathy, or migraines in any medical report produced during

the relevant period; and (2) that failing to find an impairment severe at step two is harmless if

another impairment is found to be severe. Def. Br. 8. For the following reasons, this Court will

vacate the Commissioner's decision and remand the proceedings to the ALJ.

### 1.   Medical Evidence and Objective Medical Findings do not have to be Contemporaneous with the Date of Alleged Onset to Support a Finding of Impairment.

A medically determinable impairment is one that is supported by medical evidence

consisting of clinical signs and laboratory findings. 20 C.F.R. §§ 404.1508, 404.1512(b); SSR

96-4p, 1996 WL 374187, at *1 (July 2, 1996). "Generally, an impairment must be demonstrable

by medically acceptable clinical and laboratory diagnostic techniques." Mendes v. Barnhart, 105

Fed. App'x. 347, 350 (3d Cir. 2004) (citing 42 U.S.C. § 423(d)(5)(A) (2000)); 20 C.F.R. §§

404.1527(a), 404.1529(b). There is no requirement, however, that the clinical signs and

laboratory diagnostic techniques must be contemporaneous with the alleged period of onset.

Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 547 (3d Cir. 2003). Rather, "[r]etrospective

diagnosis of an impairment, even if uncorroborated by contemporaneous medical records, but

corroborated by lay evidence relating back to the claimed period of disability can support a

finding of past impairment." Id. at 547. When a current impairment has been established by

proper medical evidence, "the onset date of the impairment may be established by evidence other

than clinical and laboratory evidence." <u>Mendes</u>, 105 Fed. App'x. at 350 (citing <u>Newell</u>, 347 F.3d at 548); <u>see</u> <u>Grebenick v. Chater</u>, 121 F.3d 1193, 1199 (8th Cir. 1997) ("Once the diagnosis is established, but the severity of the degenerative condition during the period is unanswered, the claimant may fill the evidentiary gap with lay evidence. The ALJ must consider this evidence, even if it is uncorroborated by objective medical evidence.") (internal citations omitted). Thus, the Third Circuit has held that non-contemporaneous evidence is relevant to the ALJ's determination of whether these impairments existed prior to Plaintiff's date last insured. <u>Newell</u>, 347 F.3d at 548.

## 2.  Onset Analysis under SSR 83–20

SSR 83–20 provides the analysis to be applied for determining the onset of impairments. <u>Mendes</u>, 105 Fed. App'x. at 350. SSR 83–20 provides that, for slowly progressive impairments, as are the impairments alleged here, determination of onset involves consideration of the applicant's allegations, work history, if any, and the medical and other evidence concerning impairment severity. SSR 83–20, 1983 SSR LEXIS 25, at *2. "The weight to be given any of the relevant evidence depends on the individual case." <u>Id.</u> The starting point in determining onset is the claimant's statement. <u>Id.</u>

> With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise onset date an impairment became disabling. Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available. In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process.
>
> Particularly in the case of slowly progressive impairments, it is not necessary for an impairment to have reached listing severity (i.e., be decided on medical grounds alone) before onset can be established. In such cases, consideration of vocational factors can contribute to the determination of when the disability began …

> In determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all of the evidence available. When the medical or work evidence is not consistent with the allegation, additional development may be needed to reconcile the discrepancy. However, the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record.

Id. at *5-6.

SSR 83–20 also recognizes that there may be circumstances where precise evidence of an onset date is not available:

> In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working. How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred. If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made.
>
> If reasonable inferences about the progression of the impairment cannot be made on the basis of the evidence in file and additional relevant medical evidence is not available, it may be necessary to explore other sources of documentation. Information may be obtained from family members, friends, and former employers to ascertain why medical evidence is not available for the pertinent period and to furnish additional evidence regarding the course of the individual's condition….

Id.

The Third Circuit has held that an ALJ's failure to consider retrospective testimony and failure to follow SSR 83–20 is reversible error. See Newell, 347 F.3d at 549 (reversing the ALJ's decision to deny benefits for failing to consult a medical advisor in accordance with SSR 83–20 to help him infer onset date); Walton v. Halter, 243 F.3d 703, 709 (3d Cir. 2001) (reversing the ALJ's decision to deny benefits for ignoring retrospective opinions and not consulting a medical

advisor in accordance with SSR 83–20). The ALJ's opinion cannot be based on substantial evidence and in accordance with SSR 83–20 if it ignores the retrospective opinion of doctors. Mauriello v. Astrue, No. 09-3360, 2010 WL 2079717, at *10 (D.N.J. May 25, 2010) (citing Walton, 243 F.3d at 709). However, some courts have held that Walton's directive to seek a medical advisor is limited to progressive impairments. Bailey v. Comm'r of Soc. Sec., 354 Fed. App'x. 613, 618 (3d Cir. 2009). Other courts have held that SSR 83-20 should only be applied "where medical evidence from the relevant period is unavailable." Klangwald v. Comm'r of Soc. Sec., 269 Fed. App'x. 202, 205 (3d Cir. 2008).

### 3.  Plaintiff's Non-Medically Determinable Impairments

In this case, the Court finds that the ALJ is in error insofar as he determined that Plaintiff's keloid, peripheral neuropathy, migraines, and shoulder impingement were not medically determinable solely because there was no contemporaneous objective medical evidence or findings.[8] The ALJ determined that these impairments currently exist, but that they did not exist prior to the date last insured because there was no objective medical evidence or findings. In making this determination, the ALJ failed to properly address the retrospective opinion of Dr. Bussey and diagnosis of Dr. Abboud. See Tr. 16 (noting that "Plaintiff has presented evidence of current impairment but there is no medical evidence or objective medical evidence prior to the date last insured") (emphasis added). An ALJ's decision cannot be based on substantial evidence if it fails to take into account Plaintiff's testimony and her doctor's retrospective opinion. Walton, 243 F.3d at 709.

### a.  Keloid and Peripheral Neuropathy

---

[8] The court takes note of Dr. Bussey's testimony at the hearing that there was "difficulty obtaining the records, specifically from [Plaintiff's] prior doctor …. Dr. Allen Greenberg … [who] took a long vacation and has yet to be heard from" as a reason for lack of contemporaneous medical records. Tr. 41.

Plaintiff testified that when she stopped working her neuropathy started to expand to her hands. Tr. 49. Further, after her schwannoma was removed and irradiated, she developed a neuro tremor she could not control. Tr. 49. Plaintiff stated that prior to 2003 she referred to it as a "ping" when consulting her physicians. Id. She further elaborated, "even prior to June 27th of '97, I had discussed a funny shocking feeling, like, you're shocked when you walked across he carpet in the left side of my chest and went down my hand." Tr. 50. Plaintiff stated that after radiation in 2000, "this became very severe, very pronounced." Id. When asked by the ALJ whether she was having problems with her arms and hands "back in that earlier period of time," Plaintiff testified that she was having a constant numbness, burning, and tingling sensation in both hands and both feet. Id.

Dr. Bussey testified that Plaintiff suffered from a keloid and peripheral neuropathy. Tr. 39. Dr. Bussey testified that Plaintiff had been suffering from "significant pain shooting down her arm" since the removal of a schwannoma in her chest and irradiation. Tr. 35. Further, she suffered from numbness, tingling, and decreased sensation in her hands that has gotten progressively worse. Tr. 35-36. When asked by the ALJ whether he believed the schwannoma, the keloid, the excision of either, or the radiation imposed any functional limitations by March 31, 2003, Dr Bussey testified, "[y]es, your honor … if you track her progression of her symptoms since I've known her, I believe you could extract all the way back to prior to 2003, that that was indeed causing symptoms of her neuropathy in her arms…." Tr. 39. Dr. Bussey could not be sure whether it was the schwannoma, keloid, the excision of one, the excision of both, or the over-radiation that was the definitive cause of Plaintiff's worsening neuropathy. Tr. 39-40. However, he testified that "it was likely a combination of all those involved." Tr. 40.

**b. Migraines**

At the hearing before the ALJ, Plaintiff testified that in 1998, she informed her workplace that she could no longer do her job as a collection's clerk because she was having "migraines at the time and they were debilitating." Tr. 47-48. Further, she testified that there was "no pattern to them" and that "[t]hey would come at anytime and they were very intense." Tr. 48-49. "They would last—they would come on pretty quickly and they could—they would last several hours." Tr. 51. "It included sensitivity to darkness–I mean light–so I had to be in the dark, and the noise was just incredible. I could, like, hear my heart beating in my head, and it was—it was debilitating, so—but I couldn't lay down long because of my back, so I would sit and lay in a dark room." Id.

As for Dr. Bussey, when asked specifically whether there was a central nervous system issue as of March 31, 2003, he testified,

> [I]n reviewing the history, she suffered from migraines some 20 years prior. And in talking with those involved in the case, it is possible that that was the beginning of her central nervous issue, and, in essence what we're talking about is—the reason why she's lost vision in her left eye to a major degree is because its literally falling apart. It is also…possible that the migraines could have been an early predecessor to this. Her migraines were profound without a doubt, but my opinion, in likelihood, yes. It is likely.

Tr. 37-38.

### c.  Shoulder Impingement

Plaintiff testified that, due to her shoulder, she was unable to do household chores such as laundry or cooking. Tr. 55. In order to help her around the house, her husband remodeled the kitchen shelves so that nothing was above shoulder height. Tr. 56. Plaintiff's husband also reconfigured the bathroom to accommodate her condition. Id.

Dr. Abboud diagnosed Plaintiff with "a right shoulder impingement, possible rotator cuff tear" on August 13, 2007. Tr. 314. This diagnosis was related back to the critical period through

Dr. Bussey's testimony at the hearing before the ALJ. Tr. 32. Regarding Plaintiff's shoulder impingement, Dr. Bussey began treating Plaintiff in 2005 and testified that Plaintiff presented with "multiple joint degeneration, including back pain, knee, and shoulder pain that had become progressive and significant from years prior." Tr. 33. Further, he testified that "[t]hrough exam, with the symptoms she was describing, as well as [prior] x-rays …, she clearly had moderate degeneration of … her shoulder … five to 10 years prior." Tr. 34.

### d.  The Commissioner's Arguments

For the reasons discussed above, the Commissioner's argument that there is no mention of keloids, peripheral neuropathy, or migraines in any medical report produced during the relevant period fails.  As to the Commissioner's second argument that an error in finding an impairment "non-severe" at step two is harmless, the Court finds that this contention fails to address Plaintiff's true argument. Plaintiff claims that if the ALJ determined her keloid, peripheral neuropathy, migraines, and shoulder impingement to be medically determinable impairments, the ALJ would have had to assign some limitation to those impairments in setting the RFC because non-severe impairments that are medically determinable must still be taken into account while non-medically determinable impairments do not. Pl. Br. 22-23. This case is distinguishable from the cases that the Commissioner relies on. The plaintiffs' other impairments in those cases were either found to be medically determinable, but not severe, or, were not claimed to be an impairment by the plaintiff. See Salles v. Comm'r of Soc. Sec., 229 Fed. App'x. 140, 144 (3d Cir. 2007) ("As to Salles's HIV, depression, and visual problems … the ALJ properly found these impairments to be non-severe.") (emphasis added); Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005) ("Rutherford never mentioned obesity … even when asked directly by the ALJ."); Jones v. Astrue, No. 10-3226, 2011 WL 4478489, at *9 (D.N.J. Sept. 26,

2011) (finding the ALJ's error at step two harmless because the ALJ discussed the plaintiff's

medically determinable, but non-severe impairment in determining his RFC); Schuster v. Astrue,

879 F. Supp. 2d 461, 469 (E.D.Pa. 2012) (noting that "[p]laintiff does not challenge the ALJ's

finding that the impairment was non-severe"). Thus, the ALJs in the cases cited by the

Commissioner were still required to, and did, take the medically determinable, but non-severe

impairments, into account when setting the RFC.

### e.   Considerations for Remand

On remand, the ALJ must consider Plaintiff's testimony and the retrospective opinions of

Dr. Bussey and Dr. Abboud, in accordance with SSR 83–20, to determine whether Plaintiff's

keloid, peripheral neuropathy, migraines, and shoulder impairment were medically determinable

impairments during the critical period. See Newell, 347 F.3d at 548. Additionally, the ALJ

should seek the help of a medical advisor to aid in this determination, because Dr. Bussey

testified that Plaintiff's conditions were progressing before 2003,[9] the alleged onset date is

sixteen years in the past, and the only medical records from the critical period are those of

Plaintiff's orthopedist, who treated her only for her knees. See Bailey, 354 Fed. App'x. at 618

(noting that a medical examiner must be obtained in "situations where the underlying disease is

progressive and difficult to diagnose, where the alleged onset date is far in the past, and where

medical records are sparse or conflicting.").

### ii.   The ALJ Erred in his Determination of Onset of Disability.

---

[9] Dr. Bussey testified that Plaintiff's symptoms and x-rays show she "clearly had moderate degeneration of … her
shoulder … [for] five to ten years prior." Tr. 34 (emphasis added). Dr. Bussey also testified that in 1997, a malignant
schwannoma was excised and radiated. Tr. 38. In 2000, "[r]e-excision of the area did not reveal another
schwannoma, but …, her symptoms clearly had been progressing in 2000. Id. (emphasis added). Further, Dr. Bussey
opined that "if you track her progression of her symptoms … I believe you could extract all the way back to prior to
2003, that that was indeed causing the symptoms of neuropathy in her arms…." Tr. 39. (emphasis added).

SSR 83–20 defines onset of disability ("onset") as "the first day an individual is disabled as defined in the Act and the regulations." 1983 SSR LEXIS 25, at *2; see supra Part III(B)(i)(2). For the reasons discussed supra, this Court finds that the ALJ erred in determining the onset date of Plaintiff's keloid, peripheral neuropathy, migraines, and shoulder impingement.

Plaintiff also argues that the ALJ erred in his determination of onset for Plaintiff's severe impairments of osteoarthritis of the bilateral knees because he failed to follow SSR 83–20. Pl. Br. 29-30; Pl. Resp. Br. 8. This Court will vacate and remand the ALJ's decision regarding onset of the disability for Plaintiff's osteoarthritis of the bilateral knees.

At step four, the ALJ determined that Plaintiff's osteoarthritis "could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." Tr. 17. Thus, the ALJ found that Plaintiff's RFC during the critical period was sufficient for her to return to her past relevant work as a collections clerk and a finding of not disabled was entered. Tr. 19-20.

While the ALJ did not expressly discuss SSR 83–20 in his analysis, the ALJ did consider Plaintiff's testimony in determining onset. Tr. 18-19. However, the ALJ found it not to be credible because it conflicted with Dr. Gregg's treatment notes dating from 1998–2002. Id. Further, the ALJ discussed the retrospective opinion of Dr. Bussey, but he did not assign much weight to that opinion because it also conflicted with Dr. Gregg's treatment notes from 1998–2002. Tr. 19. However, Plaintiff's critical period goes beyond May of 2002,[10] up until March 31, 2003. As discussed supra, when a current impairment has been established by proper medical evidence, "the onset date of the impairment may be established by evidence other than clinical

---

[10] Dr. Gregg's treatment records only go as far as 2002.

and laboratory evidence." <u>Mendes</u>, 105 Fed. App'x. at 350 (citing <u>Newell</u>, 347 F.3d at 548).

Thus, an ALJ cannot reject a retrospective opinion solely because there are no contemporaneous

objective medical findings or evidence to support the opinion. <u>Newell</u>, 347 F.3d at 548. That is

what the ALJ did in this case and for that he was in error. Tr. 18. The ALJ stated "treatment

records of Dr. Bussey show that [Plaintiff] continued to seek treatment for osteoarthritis of the

knees beginning in July 2005, but there is no evidence dating back to March 2003…. Dr. Bussey

provided letters in support of [Plaintiff's] allegations … but there are no medical records or

objective medical findings to support his conclusions for the requisite periods of June 1, 1998 to

March 31, 2003." <u>Id.</u> Dr. Bussey testified that there was difficulty obtaining medical records

from Dr. Greenberg who treated Plaintiff before Dr. Bussey. Tr. 41. Thus, on remand the ALJ

must consider Plaintiff's testimony and Dr. Bussey's opinion regarding the time period of May 2,

2002 through March 31, 2003 to determine whether the Plaintiff's osteoarthritis was disabling.

     Furthermore, insofar as the ALJ dismissed Dr. Diermengian's opinion that the extreme

physical limitations extended back to 2000-to-mid-2001 because there "are no medical records of

objective medical findings to substantiate the allegations during that time period," the ALJ was

also in error. Tr. 19. Thus, in addition to Dr. Bussey's opinion, Dr. Diermengian's opinion must

also be considered on remand.

### iii.   The ALJ Erred in his Determination of Plaintiff's Credibility.

     Plaintiff argues the ALJ erred in his determination that Plaintiff's testimony as to the

intensity and persistence of her symptoms was not credible. Pl. Br. 24-25. Plaintiff argues this

warrants remand because the ALJ based this almost entirely on a December 1998 treatment note

from Dr. Gregg stating that Plaintiff was working as a horse trainer. Pl. Br. 24.

When evaluating the intensity and persistence of Plaintiff's symptoms and determining how they affect Plaintiff's capacity for work, the ALJ must "consider all of the available evidence, including [claimant's] history, the signs and laboratory findings, and statements from [claimant], [claimant's] treating or nontreating source, or other persons about how [claimant's] symptoms affect her." 20 C.F.R. § 404.1529(c). The extent to which Plaintiff's statements about symptoms can be relied upon as probative evidence depends on the plaintiff's credibility. SSR 96-7p. When evaluating credibility, The ALJ's "decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight." 20 C.F.R. § 404.1529(c). "Although allegations of pain and other subjective symptoms must be consistent with objective medical evidence, the ALJ must [still] explain why he [is rejecting] the testimony." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 122 (3d Cir. 2000) (internal citations omitted).

Here, the ALJ determined none of Plaintiff's testimony regarding the intensity and persistence of her symptoms during the critical period was credible because of one treatment note from 1998 that said she was working as a horse trainer.[11] The ALJ did not explain why this single treatment note from 1998 discredited Plaintiff's testimony regarding the intensity and persistence of her symptoms from 1999–2003. Further, in light of the ALJ's failure to take into consideration the retrospective opinions of Dr. Bussey, Dr. Abboud, and Dr. Diermengian because they were not based on contemporaneous objective medical findings or evidence, but which support Plaintiff's testimony, the Court will remand because the ALJ's credibility determination was not based on substantial evidence. See Burnett, 220 F.3d at 123 (finding that

---

[11] The ALJ should resolve whether Plaintiff was in fact a horse trainer since it was not listed as past employment, on her earnings sheet, or mentioned in her testimony.

since the ALJ erred in not evaluating all of the medical evidence, the court could not then assess whether the opinion was based on substantial evidence).

### iv.   The ALJ Erred in Assigning Little Weight to the Opinions of Dr. Paul Bussey and Dr. Carl Diermengian.

Finally, Plaintiff argues that the ALJ erred in assigning little weight to the retrospective opinions of Dr. Bussey and Dr. Diermengian. Pl. Br. 26. Plaintiff argues that the ALJ was in error for assigning little weight to Dr. Bussey's opinion because the ALJ ignored or mischaracterized Dr. Bussey's testimony, and that the ALJ failed to follow SSR 83–20. Pl. Br. 27-28. In regards to Dr. Bussey's opinions concerning Plaintiff's keloid, peripheral neuropathy, migraines, and shoulder impingement,[12] this Court finds that the ALJ did not mischaracterize Dr. Bussey's testimony. Rather, he assigned it little-to-no weight in his determination that these conditions were not medically determinable impairments because there were no objective medical findings or evidence during the critical period to substantiate Dr. Bussey's opinion. Tr. 19. The analysis provided in Parts III(B)(i)(3) and III(B)(ii), supra, of this Opinion, and the Court's decision to remand has fully addressed the ALJ's failure to consider SSR 83–20 and the retrospective opinion of Dr. Bussey.

With respect to Dr. Diermengian, Plaintiff argues that the ALJ erred in giving little weight to Dr. Diermengian's opinion "as far as extending the assigned, extreme physical limitations back to the 2000-to-mid-2001 time period as there are no medical records of objective medical findings to substantiate the allegations during that period." Pl. Br. 26. Plaintiff argues there were objective medical findings to support Dr. Diermengian's opinion. Id. For the reasons

---

[12] The Court does not consider whether the ALJ erred in assigning little weight to Dr. Bussey's opinion in regards to Plaintiff's osteoarthritis of the bilateral knees because Plaintiff does not allege as much in her brief. The Court does recognize that Plaintiff's Response alleges another SSR 83–20 argument, but does not specify which conditions she is referring to. Regardless, the Court finds that any SSR 83–20 argument regarding the testimony of Dr. Bussey has been decided supra.

stated supra in Part III(B)(i) of this Opinion, the ALJ must consider Dr. Diermengian's retrospective opinion, regardless of the lack of contemporaneous objective medical findings and records to substantiate the opinion. The ALJ should employ a medical advisor to help him make this determination.

## IV.   CONCLUSION

For the foregoing reasons, the Court will vacate the Commissioner's final decision and remand the matter for further proceedings consistent with this Opinion.  An appropriate order shall enter today.


Dated:  11/12/2014                                         s/ Robert B. Kugler
                                                            ROBERT B. KUGLER
                                                            United States District Judge